IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MELVIN PEOPLES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No: 11 C 4029 |
| v. ) | |
| ) | Magistrate Judge Jeffrey Cole |
| CAROLYN COLVIN, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**MEMORANDUM OPINION AND ORDER**

The plaintiff, Melvin Peoples, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"). 42 U.S.C. § 1382c(a)(3)(A). Mr. Peoples asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

I.
PROCEDURAL HISTORY

Ms. Hurt applied for DIB on November 6, 2007, alleging that he became disabled on February 1, 2001, due to a back injury and high cholesterol. (R. 161-163, 190). His application was denied initially and upon reconsideration. (R. 72-77, 104-117). Mr. Peoples requested a hearing and, on August 28, 2009, appeared and testified before an ALJ, represented by counsel. (R. 31-71). In addition, Glee Ann Kehr testified as a vocational expert. (R. 64-68). On December 14, 2009, the ALJ issued a decision finding that Mr. Peoples was not disabled because he could perform his past medium work as an automobile assembler, as well as other medium work that exists in substantial numbers in

the economy. (R. 17-26). This became the final decision of the Commissioner when the Appeals Council denied Mr. Peoples's request for review of the decision on April 19, 2011. (R. 1-6). *See* 20 C.F.R. §§ 404.955; 404.981. Mr. Peoples has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.
## EVIDENCE OF RECORD

### A.
### Vocational Evidence

Mr. Peoples was born on March 29, 1950, making him fifty-nine years old at the time of the ALJ's decision. (R. 186). He has a fourth-grade education. (R. 195). He can neither read nor write. (R. 60-61). He was born in the rural south and quit school that early to work in the fields to support his family. (R. 60). His work experience as an adult consists of construction and assembly-line jobs which involved lifting up to 50 pounds at a time. (R. 192).

### B.
### Medical Evidence

Mr. Peoples's main problem is clearly his back impairment. He apparently injured himself at his last job, which was in construction. (R. 38). The first medical evidence comes long after that, however.

Mr. Peoples had a lumbosacral spine x-ray in October 2003 that revealed some minor changes of facet joint osteoarthritis in the lower lumbar spine. (R. 247). Dr. Patil saw Mr. Peoples for a consultative examination at the request of the Social Security Administration on December 4, 2007. (R. 242). Mr. Peoples reported constant back pain radiating to the legs, rated as 8 to 9 on a 10-point scale. (R. 242). He weighed 224

pounds. (R. 243). That made his body mass index 33. (R. 245). He told Dr. Patil that he did not take medication for pain. (R. 242). Lumbar flexion was limited to 50 degrees out of 90. (R. 244). Extension, lateral flexion, and left and right lateral bending were all limited to 20 degrees out of 25. (R. 244). Grip strength was 5/5 bilaterally. (R. 244). Mr. Peoples could heel/toe walk and squat and rise. (R. 245). X-rays showed mild anterior endplate osteophytes at T11-12 and T12-L1 and mild lower lumbar facet arthritis. (R. 245).

Dr. Bharati Jhaveri then reviewed this scant evidence for the Social Security Administration on December 31, 2007. (R. 248-258). He determined that Mr. Peoples could frequently lift 25 pounds, occasionally lift 50 pounds, sit for 6 hours each workday and stand or walk for 6 hours as well. (R. 249). There were some postural limitations: he could only balance and stoop occasionally. (R. 250).

On February 12, 2008, Mr. Peoples went to the emergency room at Oak Forest Hospital complaining of chronic lumbosacral pain. (Tr. 259). An examination appeared – the copy is nearly illegible – to reveal tenderness over the L4-5 area and positive straight leg raising. (R. 260). Mr. Peoples returned on February 21st, at which time his paraspinal muscles were "non tender" and straight leg raising was negative. (R. 270). His main complaint at that visit was frequent urination. (R. 270-71).

Dr. C. Ezike, Mr. Peoples' treating physician, submitted a report on December 23, 2008, noting that Mr. Peoples suffered from chronic low back pain, obesity, and another condition which is illegible. (R. 282). Prognosis was good. (R. 282). There was tenderness in the paralumber region and Mr. People's lumber flexion was limited to 60 degrees. (R. 282). Straight leg raising was positive on the left at 60 degrees. (R. 283).

He could heel/toe walk normally and had no focal motor deficit. (R. 283). Mr. Peoples rated his low back pain as 6/10. (R. 283). It radiated to both legs and there was bilateral lower extremity motor weakness. (R. 283). Mr. Peoples felt pain "almost daily." (R. 284). It was exacerbated when he walked one block. (R. 284). He took a number of medications – including Meclizine for vertigo, Robaxin for pain, and Naproxen for osteoarthritis – without side effects, but these did not relieve his pain. (R. 284-285). Dr. Ezike said he did not attempt to try change the medication regimen in order to produce better relief. (R. 285). Dr. Ezike felt Mr. Peoples could sit for 6 hours and stand/walk for two during an 8-hour workday. (R. 285). It would be necessary for him to change positions at will from sitting to standing. (R. 285). He could lift and carry up to ten pounds frequently and up to twenty pounds occasionally. (R. 285). He was not unable to kneel, bend, or stoop. (R. 287). He might need unscheduled 5-10 minute breaks during the workday. (R. 287). He would miss 2-3 days of work per month. (R. 287).

On January 28, 2009. Mr. Peoples returned to the emergency room with complains of low back pain. (R. 300-301). An x-ray demonstrated evidence of degenerative disc disease and straightening of the lumbar spine suggestive of muscle spasm. (R. 300). A CT scan on May 5, 2009, showed:

> [m]ild peripheral as well as central bulging of the intervertebral disc at L4-L5 and L5-S1. No evidence of compression of the dural sac, however, is present.
>
> Possible mild compression of the nerve roots both on the right as well as the left side at L4-L5 is still a possibility. Correlation with clinical history and clinical findings is recommended.

(R. 302).

Mr. Peoples saw Dr. Ezike again on July 21, 2009. Mr. Peoples rated his pain that day at 4/10. (R. 347). At 5'9" tall, he weighed 232 pounds. (R. 347). There was lower extremity weakness. (R. 347). Flexion was limited to 45 degrees. (R. 347). Straight leg raising was positive bilaterally. (R. 347). He had difficulty performing heel/toe walking. (R. 347). Grip strength was reduced to 4/5. (R. 347). Mr. Peoples had no improvement with physical therapy; he declined surgical intervention. (R. 348).

Mr. Peoples returned to see Dr. Erike on October 14, 2009. He weighed 242 pounds. (R. 345). Dr. Ezike's examination revealed limited flexion in the spine with pain, paraspinal tenderness, difficulty with toe and heel walking, and decreased left hand grip. (R. 345). The doctor diagnosed chronic low back pain and radiculopathy, hypertension, and obesity. (R. 346). Dr. Erike noted no significant changes the next two times Mr. Peoples came in on February 24, 2010 (R. 342-343) and May 12, 2010. (R. 339-340). On May 19, 2010, Mr. Peoples went to the pain clinic for complaints of increased back pain. (R. 351). A CT scan of the lumbosacral spine dated June 7, 2010, revealed no changes since the prior CT scan in May 2009. (R. 336).

### C.
### Administrative Hearing Testimony

#### 1.
#### Plaintiff's Testimony

Mr. Peoples described suffering from aching pain in his back and legs and spasms in the back. (Tr. 57). He hurt his back at his construction job in 2000. (R. 38, He tried to return after that but only lasted a month. (R. 47). He recently had six weeks of physical therapy. (R. 47). He also take medications for his pain. It "calms it down" but it doesn't make it go away. (R. 48-49). The pills made him drowsy or dizzy. (R. 50-52).

He also took medication for hypertension and high cholesterol, and to relieve control his dizziness. (R. 52).

Mr. Peoples stated that he can stand for approximately ten minutes. (Tr. 58). He can sit for about 30 minutes at a time. (Tr. 59). He can walk for one block. (Tr. 57). Mr. Peoples estimated that he can lift eight to ten pounds. (R. 57). Ms. Peoples makes breakfast for himself in the morning and spends most of the day sitting and watching TV. (Tr. 53-54). He also sometimes sleeps during the day and would "try" and walk around the house (Tr. 54). Mr. Peoples states that he helps with the cleaning and laundry (Tr. 55). When he vacuums, it takes a long time because he has to start and stop. (R. 62). He cannot lift a full load of laundry. (Tr. 62). Sometimes he does the dishes and cooking. (Tr. 56). When doing the dishes, he sometimes had to lean on the sink to relieve the pressure on his back. (R. 58). He said he was afraid to have surgery, although it had been suggested. (R. 59).

## 2.
## Vocational Expert's Testimony

The Vocational Expert ("VE") testified that an individual of Mr. Peoples' age, education, and work history who can perform medium work with limitations to occasional stooping and crouching could perform Mr. Peoples' past work as an auto parts assembler as it is typically performed (Tr. 64-65). He also testified that such an individual could perform other work as a conveyer off bearer, a production helper, and a sorter (Tr. 66). However, the VE stated that if the individual also needed to alternate sitting and standing, he could not perform any medium work (Tr. 68). The VE testified that if Mr. Peoples were limited to sedentary work he could not perform any work (Tr.

67). He also stated that an individual who would be absent from work two to three times a month would be unable to work. (R. 67).

## D.
## ALJ's Decision

The ALJ found that Mr. Peoples suffered from the following severe impairments: chronic low back pain, history of high cholesterol, and obesity. (R. 19). The ALJ determined that Mr. Peoples did "not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Subpt. P, Appendix 1 (20 CFR 404.1520(d), 404. 1525 and 404.1526)." (R. 19). More specifically, he did not meet the listing for disorders of the spine because there was no evidence of nerve root compression and positive straight leg raising, or inability to ambulate effectively. The ALJ also considered the listings for the cardiovascular system and hematological disorders, but there was no evidence to satisfy those categories. He also considered Mr. Peoples' obesity, noting it was level I and that it had no effect on his ability to ambulate effectively. (R. 20).

Next, the ALJ determined that Mr. Peoples "has the residual functional capacity to perform less than the full range of medium work as defined in 20 CFR 404.1567(c)." Mr. Peoples had additional restrictions insofar as he could only occasionally kneel, stoop, crouch, or crawl. (R. 20). The ALJ went over Mr. Peoples' testimony as to his limitations. He noted that Mr. Peoples said he could do laundry, vacuum, cook, and wash dishes. He could walk no more than one block due to pain in his back and legs. He could sit for 30 minutes and stand for 10. (R. 21). The ALJ compared that to the report from Dr. Patil, the consultative examiner. (R. 21-22). He also noted that there was x-ray evidence of a mildly bulging disc and possible mild nerve root compression. (R. 21).

The ALJ found that Mr. Peoples' statements regarding the intensity of his symptoms were not entirely credible to the extent they conflicted with his finding that Mr. Peoples could do a reduced range of medium work. (R. 22). The ALJ said that Mr. Peoples had been able to perform his past medium work despite having had a back impairment for fifteen years. (R. 22). He also felt that Mr. Peoples' course of treatment was not what one would expect from someone with a disabling back impairment. While Mr. Peoples was afraid of having back surgery, the ALJ supposed that he could overcome this fear if his pain was as severe as he claimed. (R. 22). The ALJ also noted that Mr. Peoples only had a limited course of physical therapy, and that Mr. Peoples explained that he did not have money for treatment. The ALJ stated that Mr. Peoples did not seek treatment when he was working, during which time he would have had the money. (R. 22).

The ALJ thought Mr. Peoples' daily activities were limited by choice and not as a result of his impairments. His extreme limitations in standing and sitting were not supported by the medical evidence. (R. 23). The ALJ found that opinion of Mr. Peoples' treating physician to be inconsistent. Although the doctor said Mr. Peoples' pain was not entirely relieved with his medications, he did not adjust them. (R. 23). While the doctor found a limited range of lumbar motion, he found no limitations on kneeling, bending, or stooping. (R. 23). The doctor felt the prognosis was good. The ALJ thought the limitations Mr. Peoples' treating physician found were not supported by any medical evidence or treatment he provided. (R. 23).

Instead, the ALJ gave the reviewing physician's opinion the great weight. (R. 24). The tacitly acknowledged that the reviewing physician had not seen any of the later

evidence, but said that he reviewed that more recent evidence and found it did not change the reviewing physician's evaluation. (R. 24). The ALJ, therefore, adopted the reviewing physician's residual functional capacity finding. (R. 24).

The ALJ went on to find that Mr. Peoples could perform his past relevant work as generally performed in the economy, based on the VE's testimony. (R. 24). The ALJ also found that Mr. Peoples could perform other medium work. He based this on the VE's testimony and use of the Medical-Vocational Guidelines as a framework . (R. 25). Accordingly, the ALJ concluded that Mr. Peoples was not disabled. (R. 22).

## IV.
## DISCUSSION

### A.
### Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept to support a conclusion.'" *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010)(*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The court may not reweigh the evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, (7th Cir. 2008); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of

the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). An ALJ is required to "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

**B.
Five-Step Sequential Analysis**

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.
### Analysis

Mr. Peoples finds fault with four aspects of the ALJ's decision. He argues that the ALJ did not properly consider the opinion of his treating physician. In addition, Mr. Peoples contends that the ALJ failed to properly consider his obesity. He also says that the ALJ did not properly assess his credibility. Finally, Mr. Peoples argues that the ALJ relied upon flawed vocational testimony.

A treating physician's opinion that is consistent with the record is generally entitled to "controlling weight." 20 C.F.R. § 404.1527(d)(2); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011); *Schaaf v. Astrue,* 602 F.3d 869, 875 (7th Cir.2010). If an ALJ chooses to reject a treating physician's opinion, he must provide sound reasons for doing so. 20 C.F.R. § 404.1527(d)(2); *Jelinek*, 662 F.3d at 811; *Campbell v. Astrue,* 627 F.3d 299, 306 (7th Cir.2010). Here the ALJ felt that Dr. Ezike's opinion was of little value because: (1) he characterized Mr. Peoples' prognosis as "good"despite the fact that he had extreme limitations in ability to walk, sit, stand, lift and carry, (2) he noted that Mr.

Peoples had not been completely relieved of pain, but he did not adjust Mr. Peoples' medication, and (3) he found a limited range of motion in the lumbar spine and lower extremity weakness but did not find any restrictions on kneeling, bending, or stooping. (R. 23).

Upon examination, these reasons are rather flimsy. A lower back impairment with a "good" prognosis is not the equivalent of being able to perform an auto assembly job entailing frequent lifting and carrying of 25 pounds and occasional lifting and carrying of 50 pounds. Similarly, it is unclear how Dr. Erike's choice to keep Mr. Peoples on no more than the four medications he was taking undermines the restrictions the doctor found him to have. Mr. Peoples was already taking Robaxin for pain, Naproxen for pain, two other medications for hypertension and high cholesterol, and Meclizine for dizziness that came as a side effect of these prescriptions. "There can be a great distance between a patient who responds to treatment and one who is able to enter the workforce . . . ." *Scott v. Astrue*, 647 F.3d 734, 739-40 (7th Cir. 2011).

Finally, Dr. Erike did not say that Mr. Peoples had an unlimited capacity to kneel, bend, and stoop. He said that Mr. Peoples was not completely incapable of doing those things. The form Dr. Erike filled out asked him whether "there are any other limitations that would affect your patient's ability to work at a regular job on a sustained basis . . . ?" (R. 287). There were sixteen items that could be checked, including "*no* kneeling", "*no* bending", and "*no* stooping." (R. 287 (emphasis added)). So, according to the form, Mr. Peoples might have been able to do each of these activities on a single occasion each workday. That's not inconsistent with a finding of 60 degrees lumbar flexion out of 90 degrees.

Still, the ALJ did at least posit what, in his judgment, he thought were good reasons for not assigning Dr. Erike's opinion controlling weight. But those questionable reasons become even less convincing when coupled with the ALJ's decision to accord controlling weight to the opinion of the doctor that reviewed the medical evidence in December 2007, two years before the record was complete and appropriating that opinion for his finding as to Mr. Peoples' residual functional capacity. All things being equal, an ALJ will be hard-pressed to "justify casting aside [a treating physician's] opinion in favor of [an] earlier state-agency opinion[]." *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011).

Here, the ALJ chose to favor a two-year old opinion based on a report of a 30-minute consultative examination over the opinion of a treating physician who had seen Mr. Peoples on at least 3 occasions, at the time of his opinion, and continued to treat him regularly thereafter. In so doing, the ALJ did not offer an explanation of what put the reviewing physician's opinion over the top. There are a number of considerations that an ALJ must address in assigning weight to any medical opinion. *See* 20 CFR 416.927(d); *see McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011)(ALJ must explain weight given to state agency physician's opinion) He didn't mention any of them in adopting the opinion of the agency doctor who looked at the report from the consultative examination two years before the ALJ's decision.

To make matters worse, the ALJ was untroubled by the fact that the reviewing physician did not have the complete medical record before him. That record would eventually include Dr. Erike's opinion, pages of treatment notes from Dr. Erike depicting a worsening condition – degenerative disc disease is a deteriorating impairment – and CT

scan evidence of a bulging disc and possible nerve root compression. The ALJ explained that he looked at this later evidence and it wouldn't have changed the reviewing doctor's opinion. (R. 24).

The reviewing physician noted no paravertebral tenderness or deformities of the spine. Motor strength was normal in all extremities. An x-ray showed some mild facet degenerative disease and some minor osteophyte formation in the thoracic spine. He made no mention of any limitation of motion in the lumbar spine or obesity. (R. 255). In the succeeding two years, there was repeated evidence of positive straight leg raising (R. 260, 283, 347), paravertebral tenderness (R. 282, 345), and decreased motor strength ion the lower extremities. (R. 283, 347). There was significant limitation of motion in the lumber spine, ranging from 33% to over 50%. (R. 282, 345, 347). X-rays showed degenerative disc disease and straightening of the spine. (R. 300). And, there were CT scans showing evidence of a bulging disc and possible nerve root compression. (R. 302). The reviewing physician was aware of none of these findings when filled out his form. And the ALJ, who is not a doctor, was in no position to say that they wouldn't have affected the treating physician's opinion. *See* . *See Harlin v. Astrue*, 424 Fed.Appx. 564, 568, 2011 WL 2313157, *3 (7th Cir. 2011)(ALJ was unqualified to predict how additional evidence might affect a doctor's opinion); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007)(". . . an ALJ cannot play the role of doctor and interpret medical evidence when he or she is not qualified to do so.").

The ALJ accorded "great weight" the reviewing physician's opinion. Despite the fact that it was not based on all the evidence of record and was two years old, the ALJ called it "the most informed." (R. 24). He brushed aside subsequent evidence that

arguably may have changed the reviewing physician's mind about whether Mr. Peoples could perform medium work because, in the ALJ's unqualified opinion, it would not have mattered to the doctor. The ALJ then adopted the reviewing physician's opinion as his residual functional capacity finding. Perhaps the agency doctor would have done as the ALJ predicted, but perhaps he would have found additional limitations as a result of the subsequent evidence. As it stands, however, the ALJ's residual functional capacity finding is flawed and a remand is necessary. The flawed residual functional capacity finding, in turn, undermines the VE's testimony which was based on that finding and which the ALJ relied upon to find Mr. Peoples not disabled.

The ALJ also made some questionable calls assessing Mr. Peoples' credibility. He was troubled by the fact that Dr. Erike failed to increase or change Mr. Peoples' medication even though his pain was not eliminated. Here, again, the ALJ is substituting his lay judgment for that of a doctor. As already noted, Mr. Peoples was on several medications, one of which for side effects he was already experiencing – a fact the ALJ ignored when noting Mr. Peoples' medications. (R. 21). Perhaps his physician decided that this was enough, and whatever benefits that may come from increased dosage would be outweighed by increased drowsiness and dizziness. It's not for a court to say, and it's not for an ALJ to say either. *Myles v. Astrue*, 582 F.3d 672, 677 -678 (7th Cir. 2009)(ALJ was not permitted to infer that doctor did not prescribe particular medication because impairment was not a significant problem).

The ALJ also had an interesting take on Mr. Peoples' inability to afford more than a few physical therapy sessions:

> [Mr. Peoples] described the one therapy session this year that was for a limited six week period. If his back injury required such a short span of

> therapy, then his pain and limitations are not as severe as he alleges. He indicated he has not had the treatment required because he does not have the money. However, he has worked in the past with this back pain and he does not indicate he had any treatment when he did have the money. The fact that he does not receive this treatment undermines the reliability of his severe limitations.

(R. 22). It's difficult to follow the ALJ's logic. An inability to afford treatment is a valid reason for not pursuing it. *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012); *Myles*, 582 F.3d at 677. Apparently the ALJ would only be convinced that Mr. Peoples was telling the truth about his impecuniosity if Mr. Peoples proved that he had paid for regular physical therapy sessions while he was able to work – *before* he became disabled. Even if there were a thread of logic to that, the ALJ never asked Mr. Peoples whether he had.

The ALJ's treatment of Mr. Peoples' testimony about his daily activities was also questionable. The ALJ began his credibility assessment by charging that Mr. Peoples' testimony about what he did all day could not "be objectively verified with any degree of certainty." (R. 23). It's not clear what the ALJ might have been looking for there because that's always the case. ALJ's don't set up shop at claimants' homes and record their every move. The ALJ also said that the fact that Mr. Peoples could do laundry, cook, vacuum and watch television did not support a restriction to less than medium work. (R. 23). The Seventh Circuit has repeatedly chastised ALJs for failing to consider the difference between sporadically performing a few household chores and being able to work at a job eight hours a day, five days a week. *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012); *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011). Judge Posner has called this recurrent failure "deplorable. *Bjornson*, 671 F.3d at 647. It is highlighted here by the fact that the ALJ ignored Mr. Peoples' testimony that he had to take breaks

while vacuuming, had to lean on the sink while doing dishes, and could not lift a full load of laundry.

Finally, there is Mr. Peoples' obesity. The ALJ did consider Mr. Peoples' obesity when determining whether his condition met a listed impairment. (R. 20). But he did not discuss it in connection with Mr. Peoples' residual functional capacity. And so, the extent of the ALJ's analysis is: "[Mr. Peoples] can ambulate effectively; therefore, I find that none of the above Listings have been met or equaled." (R. 20). The applicable Social Security Ruling requires the ALJ to consider obesity's effect, not just in terms of the Listings, but in terms of residual functional capacity as well. SSR 02-1p (" . . . our RFC assessments must consider an individual's maximum remaining ability to do ordinary work activities in an ordinary work setting on a regular and continuing basis. . . . In cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity."). In other words, the ALJ had to look beyond the ability to "ambulate effectively." *See Arnett v. Astrue*, 676 F.3d 586, 593 (7th Cir. 2012)("An ALJ must factor in obesity when determining the aggregate impact of an applicant's impairments.").[1]

---

[1]In cases like *Arnett*, the court finds it incumbent on the ALJ to discuss obesity even if the claimant fails to provide evidence of limitations. 676 F.3d at 593. "If the ALJ th[inks] that [the claimant's] obesity has not resulted in limitations on her ability to work, he should [] explain[] how he reached that conclusion." 676 F.3d at 593. However, in other cases, the court suggests that the onus is on the claimant to explain how his obesity would affect the ALJ's five-step analysis. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). The better rule is clearly to put the burden on the claimant because he or she is in a far better position to explain how being overweight affects their ability to work. Moreover, if there is no explanation of the claimant's obesity-related limitations from a physician, the ALJ would be merely speculating on any restrictions that may result. But as this case must be remanded anyway, the choice of applicable case law is of no consequence.

In assessing Mr. Peoples' residual functional capacity , the ALJ relied upon the reviewing physician's report, which ignored the consultative examiner's finding. *See Arnett*, 676 F.3d at 593 (failure to consider obesity would be harmless where ALJ adopted limitations suggested by physicians who discussed obesity). Moreover, when discussing Mr. Peoples' weight in terms of the Listings, the ALJ's reliance on the two-year-old evidence lead him to ignore the fact that Mr. Peoples' obesity had crept up to Level II from Level I. (*See* R. 345). In a case like this, where there are other flaws in the ALJ's residual functional capacity finding, it cannot be said that this failure amounted to nothing more than harmless error. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

## V.
## CONCLUSION

The plaintiff's motion for summary judgment or remand [#14] is GRANTED, and the Commissioner's motion for summary judgment is DENIED.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 7/1/13